UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION


UNITED STATES OF AMERICA                                PLAINTIFF

v.                                CRIMINAL ACTION NO: 3:16cr76

RODNEY NELSON                                           DEFENDANT




TRANSCRIPT OF MOTION TO SUPPRESS


FRIDAY, AUGUST 25, 2017


BEFORE THE HONORABLE DANIEL P. JORDAN III
UNITED STATES DISTRICT JUDGE













COURT REPORTER:

FRED W. JESKE, RMR, CRR
701 NORTH MAIN STREET, SUITE 228
HATTIESBURG, MISSISSIPPI  39401
(601) 255-6432
fred_jeske@mssd.uscourts.gov

1    APPEARANCES:

2    REPRESENTING THE PLAINTIFF:

3        JERRY RUSHING, ESQUIRE
         OFFICE OF THE UNITED STATES ATTORNEY
4        501 EAST COURT STREET, SUITE 4.430
         JACKSON, MISSISSIPPI  39201
5        (601) 965-4480
         jerry.rushing@usdoj.gov

6

7    REPRESENTING THE DEFENDANT:

8        MICHAEL L. KNAPP, ESQUIRE
         Michael Knapp, Attorney at Law
9        405 Tombigbee Street
         Jackson, MS 39201
10       601/988-5308
         mknap56@comcast.net

11

12

13                        -oOo-

14

15

16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

1          THE CLERK:  All rise.

2          THE COURT:  All right.  Thank you.  You may be seated.

3     All right, Mr. Knapp.

4          MR. KNAPP:  Your Honor, I understand the government's

5     rested.

6          We would call to the stand the defendant, Mr. Rodney

7     Nelson.

8          I have explained to Mr. Nelson his rights under the Fifth

9     Amendment.  Our next witness, Your Honor, is Rodney Nelson, and

10    I have explained to him at length again his right under the

11    Constitution not to incriminate himself and the nature of

12    perjury, so I would call him as a witness, Your Honor.

13         THE COURT:  All right.  Thank you, Mr. Nelson.  You

14    can sit up here.

15         I think we swore him in at the beginning, didn't we?

16         THE CLERK:  Yes.

17         THE COURT:  Mr. Nelson, let me just remind you you're

18    still under oath.

19         THE DEFENDANT:  Yes, sir.

20         THE COURT:  We talked about this last week, but I

21    think I'm required to put it on the record.  You understand

22    that you're not required to testify; that nobody can make you

23    testify if you wanted to remain silent.  That is your right and

24    your silence cannot be held against you.  If, on the other

 1 | hand, you wish to testify, it's also your right to do that, you

 2 | know, subject to cross-examination based on what you say.

 3 |      You understand that those are your rights?

 4 |           THE DEFENDANT:  Yes, sir.

 5 |           THE COURT:  You understand that those are -- only you

 6 | can exercise those rights; your attorney can't make that

 7 | decision for you?

 8 |           THE DEFENDANT:  Yes, sir.

 9 |           THE COURT:  All right.  Go ahead.

10 |           MR. KNAPP:  Your Honor, I'm going to introduce this

11 | witness for the purpose of this hearing only.

12 |      I believe the rules of evidence allow that.

13 |           THE COURT:  All right.

14 |                     RODNEY CORNELL NELSON,

15 |   having been first duly sworn, testified as follows:

16 |                      DIRECT EXAMINATION

17 | BY MR. KNAPP:

18 | Q.  Mr. Nelson, what is your full name?

19 | A.  Rodney Cornell Nelson.

20 | Q.  And before your incarceration, where did you live?

21 | A.  726 Westmont Drive.

22 | Q.  And you are the defendant here today; is that correct?

23 | A.  Yes, sir.

24 | Q.  And you have been in the courtroom the entire time the

25 | government's witnesses have testified; is that correct?

1  A.  Yes.

2  Q.  And you understand -- do you understand I filed two motions

3  today?

4  A.  Yes.

5  Q.  And one was the one relating to the automobile and the

6  other one's related to the wiretap?

7  A.  Um-hum.  Yes

8  Q.  Now whose idea was it to file the one on the wiretap?

9  A.  Mine.

10  Q.  Okay.  And you requested me to file it?

11  A.  Yes.

12  Q.  Now, taking them one at a time, we're going to aim at the

13  stop, the arrest of the automobile.

14  A.  Okay.

15  Q.  Do you dispute what you have heard today from the

16  government's witnesses, that you were stopped on February 19th?

17  A.  You mean disagree with what they said?

18  Q.  I'm sorry?

19  A.  You mean disagree with what they said?

20  Q.  Yes.

21  A.  Yes.

22  Q.  And you heard officers testify you were driving either

23  carelessly or erratic.  Did you hear that?

24  A.  Yes.

25  Q.  Were you driving carelessly or erratically?

```
 1   A.   No.

 2   Q.   Had you had any PCP or any other controlled substance --

 3   A.   No, not --

 4   Q.   -- that day?

 5   A.   I hadn't made it home to smoke any.

 6   Q.   Okay.  Did you have any alcohol?

 7   A.   No.  I don't drink.

 8   Q.   If you remember, did you have any feeling of impairment of

 9   you operating the vehicle?

10   A.   No.

11   Q.   Do you remember crossing any lines or centerlines while you

12   were driving?

13   A.   No.

14   Q.   Now, in chronological order, the best you can, can you tell

15   us kind of how this stop occurred, this vehicle stop occurred,

16   starting at the time you were told to pull over.  How did that

17   happen?  Did blue lights come on?

18   A.   I was coming down Lindsay Drive, and as I approached the

19   side street, Jayne Avenue, I seen a Hinds County Sheriff's

20   Department car setting there, and so I didn't think nothing of

21   it, and I just kept going and turned on Chennault.  And when I

22   turned on Chennault, he turned behind me and turned his blue

23   lights on and I pulled over.

24   Q.   At that point in time, what happened?

25   A.   The officer approached my car, asked me did I have a
```

1  driver's license, and I told him, yes, I had a driver's

2  license, but he never asked to see them.  He just asked did I

3  have them, which they knew I had a driver's license because I

4  get pulled over by them all the time.

5  Q.  Okay.  All right.  And after that, what happened?

6  A.  He asked was anything in my truck or anything.  I said, No,

7  not that I know of.  And then that's when the guy on the

8  passenger side said, yeah, I got a gun, I got my gun here.

9  Q.  Okay.  Did you ever make a statement to the officer that

10  stopped you that either of the guns was yours?

11  A.  No.

12  Q.  Where were, where were the guns?  Did you see where they

13  were found?

14  A.  The guy had one gun on him and he had put the other one on

15  my back seat.

16  Q.  Okay.  And that's your passenger?

17  A.  Yes.

18  Q.  Now, did the officer ask permission to search your car?

19  A.  No.

20  Q.  Okay.  When in this did the officer begin searching your

21  car relating to, for example, your passenger saying "I got a

22  gun"?

23  A.  He asked, he asked me to step out, and he walked around to

24  the passenger side with me, and he asked the passenger to step

25  out.

1    Q.   Okay.  Did he put handcuffs on you at that time?

2    A.   No.  No one was in handcuffs.

3    Q.   And did he conduct a search of the vehicle at that time?

4    A.   By that time an officer pulled up, and he made them stand

5    with us, and then he just started searching my vehicle.

6    Q.   He started...

7    A.   Searching, after the other officers pulled up.

8    Q.   And that's the same officer who was here today?

9    A.   Yes.

10   Q.   Now, you know they found a small bottle, which they claim

11   is PCP.  Did that belong to you?

12   A.   Did it belong to me?

13   Q.   Yes.

14   A.   Um-hum.  That's the only thing they did.

15   Q.   Okay.  Did you know the guns were in the car?

16   A.   No.

17   Q.   Is the first time you found out about the guns when they

18   were uncovered?

19   A.   Um-hum.

20   Q.   And you said your passenger had a pistol.  Was he wearing

21   it?

22   A.   He had it on him.  And when he told him he had it, he took

23   it out.

24   Q.   Oh, he took out the pistol?

25   A.   Yeah, he took it out and set it on the seat.

1    Q.  The passenger?

2    A.  Um-hum.

3    Q.  Now, you said the PCP was yours.

4    A.  Yes, sir.

5    Q.  Or whatever was in that bottle.

6         And you understand that you're charged with selling PCP,

7    among other drugs?

8    A.  Um-hum.

9    Q.  Was that PCP, if that's what it was -- I mean was it PCP, I

10   guess?

11   A.  Yes, it was PCP.

12   Q.  Was that for your personal use or were you fixing to sell

13   it to somebody?

14   A.  Oh, that was for my personal use.  I was headed home to

15   smoke some.

16   Q.  How full was the bottle?

17   A.  It wasn't even halfway.  It was about that much in there

18   (indicating).

19   Q.  Okay.  Could you describe for me and the court how you use

20   PCP.

21   A.  Say, for instance, you fixing to smoke a cigarette, you

22   just take the cigarette, take the top of the bottle, take the

23   cigarette and dip it in it.

24   Q.  Use a cigarette or a cigar?

25   A.  Well, in my case I use a cigar.  It's the same, take the

1  top off, dip it, and then the cigar absorb it.

2  Q.  And if you know, what amount of PCP would be absorbed, of

3  that bottle, of what was in the bottle, would be absorbed by

4  sticking a cigar into it?

5  A.  I just can't say a measurement, but it would be quite a

6  bit.

7  Q.  Okay.

8  A.  By being a cigar.

9  Q.  Does the PCR -- PCR! -- is the PCP soaked into the cigar?

10 A.  Yes.

11 Q.  And do you light it and smoke it?

12 A.  Um-hum.

13 Q.  Now, at what point in time were you put in handcuffs?

14 A.  I never was put in handcuffs.

15 Q.  Okay.  So they just let you stand around?

16 A.  There was another officer standing, a Hinds County sheriff

17 standing beside us.

18 Q.  Okay.  How many people law enforcement were there in total?

19 A.  Probably about four.

20 Q.  And I believe they seized the guns; is that correct?

21 A.  Um-hum.

22 Q.  Okay.  And they seized the pistol?

23 A.  Um-hum.

24 Q.  And the PCP?

25 A.  Um-hum.

1    Q.  Did you make any statements to the officer about the nature

2    of the PCP, whether it was for personal use or --

3    A.  He never asked me anything about it.

4    Q.  The officer ever ask you if they were his guns?  Your guns.

5    I'm sorry.

6    A.  No, because the guy told him, told him about the guns, they

7    said they were his.

8    Q.  You've indicated in your motion that there was no necessity

9    for the wiretap, I believe it was, dated I believe it was the

10   12th of February; is that correct?

11   A.  Um-hum.

12   Q.  Is that correct?

13   A.  I think that's the correct date, I think.

14   Q.  Whatever date's on there.

15       Would you explain to the court what you mean by there not

16   being a necessity for wiretap authorization.

17   A.  Because, to my knowledge, they had -- had me to sell the

18   agent and the CI some drugs, and then while doing that they end

19   up getting my source of supply.  They knew who he was and they

20   had his phone number.

21       So what was the sense of tapping my phone?  I felt that

22   they was invading my privacy.  And that was before February.

23   Q.  And you saw my cross-examination of the DEA agent relating

24   to the dates of the wiretap?

25   A.  Um-hum.

1  Q.  Did he charge you with any crimes after February the 19th?

2  A.  Not that I --

3          MR. KNAPP:  May I approach the court reporter, Your

4  Honor?

5          THE COURT:  You may.

6          MR. KNAPP:  Do you have the exhibits?

7          THE CLERK:  I do.

8     (Discussion with the clerk.)

9          MR. KNAPP:  May I approach the witness, Your Honor?

10          THE COURT:  Yes, sir.

11  BY MR. KNAPP:

12  Q.  I'm going to hand you a document and ask if that refreshes

13  your memory in regards to my last question, which are relating

14  to whether or not you were charged with any crimes after

15  February the 19th.

16  A.  No, after February 19, no.

17  Q.  And you're referring to the indictment which has been

18  admitted judicially; is that correct?

19  A.  Yes.  Yeah, um-hum.

20          MR. KNAPP:  May I approach?

21          THE COURT:  Yes.

22          MR. KNAPP:  The court would indulge me.

23  BY MR. KNAPP:

24  Q.  Were you issued any tickets for traffic violations that

25  night, February the 19th?

1    A.   No.

2    Q.   By anyone?

3    A.   No.

4    Q.   Were you notified you were under arrest at that stop?

5    A.   No.

6              MR. KNAPP:  Your Honor, I tender the witness.

7              THE COURT:  All right.  Cross.

8                         CROSS-EXAMINATION

9    BY MR. RUSHING:

10   Q.   Mr. Nelson, how you doing, sir?

11   A.   I'm all right.  You?

12   Q.   Mr. Nelson, I believe you testified that the PCP that was

13   found inside the car that night, that was your PCP?

14   A.   It was.

15   Q.   And before you obtained that PCP did you in fact call

16   different people to try to locate that PCP?

17   A.   I may have.

18   Q.   And before that night did anyone call you trying to buy PCP

19   from you?

20   A.   No, because I don't sell PCP.

21   Q.   I'm sorry?

22   A.   No, I don't sell PCP.

23   Q.   Okay.  You don't sell PCP?

24   A.   No, I do not.

25   Q.   Did you attempt to sell PCP to an undercover officer?

1    A.   I didn't -- I'm not going to say I attempted.

2         I was just helping someone that have PCP sell it, and I let

3    him sell it to the agent, not me.

4    Q.   Now you said whenever the officer came to the car that

5    night that you didn't say anything about a gun, but you said

6    that the person inside the car did; is that correct?

7    A.   Um-hum.

8    Q.   And he said that -- did he say both those guns were his or

9    one of them was his?

10   A.   They both -- he said both of them was his.

11   Q.   And he said the pistol was on his person; is that correct?

12   A.   Um-hum.

13   Q.   At what point did he take that pistol off his person?

14   A.   After he told officer that he had it.

15   Q.   Did the officer see him take it off his person?

16   A.   Yes.

17   Q.   On that particular -- this is back on February the 19th

18   of 2015.  On that time period were you a convicted felon?

19   A.   Yes.

20   Q.   So you couldn't possess a firearm; is that correct?

21   A.   No, I couldn't.

22   Q.   Now, what kind of gun was that in the trunk, in the back

23   seat of that car?

24   A.   They said it was an AK-47.  I'm not sure.

25   Q.   Yes, sir.  Did you see the gun?

1  A.  I seen it after they took it out, put it on the hood on the

2  police car.

3  Q.  When's the first time that you saw that AK-47 inside your

4  car?

5  A.  I never saw it on the inside.

6  Q.  That's your car, though; right?

7  A.  Um-hum.

8  Q.  Can you explain how the gun got into the car.

9  A.  Because I would have picked the guy up, and where I picked

10  him up from, I went on the inside; when I came back out, he was

11  already in the car.

12  Q.  Were you inside the I guess house with him?

13  A.  I was going to the inside where he was at, where he was

14  located at.

15  Q.  He came out with you with the guns?

16  A.  No.  I went on the inside, and when I came back out he was

17  already in my truck.

18  Q.  Do you know how the guns got in your car, then?

19  A.  Apparently he put them in there, because I didn't.

20  Q.  I'm sorry?

21  A.  I said apparently he put them in there because I didn't.

22  Q.  But you never saw anybody put the guns in the car?

23  A.  No.

24  Q.  The AK-47?

25  A.  Unh-unh.

1  Q.  Later that night you were not arrested; is that correct?

2  A.  No, I wasn't.

3  Q.  And do you recall around 9:50 that night that you used your

4  phone and called a person at (601) 260-7998?

5  A.  I guess.

6  Q.  Do you know what number that is?

7  A.  No.

8  Q.  Do you remember telling that person that the police took my

9  .45?

10  A.  No.

11  Q.  Do you remember telling that person that they took my AK,

12  Bro?

13  A.  No.  That was the guy on the passenger side.

14  Q.  I'm sorry?

15  A.  That was the guy on the passenger using my phone.

16  Q.  And also about that they got the half bottle of wet from

17  me?

18  A.  He just was saying that.

19  Q.  That wasn't you on the phone; that was somebody else?

20  A.  That was the guy on the passenger side on the phone, not

21  me.

22  Q.  But you would agree that was your phone, though.

23  A.  That was my phone.

24  Q.  Had you heard that conversation on the, on the -- have you

25  been played that conversation by your defense attorney on the

1    CDs?

2    A.  I haven't heard it.

3    Q.  That particular phone call there to see if that was your

4    voice or not?

5    A.  I haven't heard it.

6    Q.  You haven't heard it, so you don't know if it's your voice

7    or not?

8    A.  It shouldn't be.  But I haven't heard it.

9    Q.  The cigar inside the car, was that your cigar or the

10   passenger's?

11   A.  That was mine.

12   Q.  And you said that -- I understood on direct examination

13   that you would -- you used the PCP yourself; is that correct?

14   A.  Yeah, I do.

15   Q.  And you talked about the process of dipping the PCP into

16   the -- or the cigar into the PCP; is that right?

17   A.  Um-hum.

18   Q.  And you had half a bottle of PCP?

19   A.  It was under a half.

20   Q.  Pardon?

21   A.  It was under a half, I believe.

22   Q.  Okay.  It was about 15 milliliters, is that about correct?

23   A.  Probably.  Yeah, it probably was.

24   Q.  And you explained you took the cigar, you dipped it in the

25   PCP, and you smoked it.  Is that how you do it?

1   A.  I didn't smoke it.  I didn't have a chance to smoke it.

2   Q.  Is that how you usually do that?

3   A.  Yeah, that's how you usually do that.

4   Q.  When you smoke it?

5   A.  When did I smoke it?

6   Q.  No.  When you smoke it, that's how you do it; is that

7   correct?

8   A.  Yeah, um-hum.

9   Q.  And how many cigars could you get out of that bottle of

10  PCP?

11  A.  Hmm.  Probably about four, maybe four and a half.

12  Q.  Only four and a half cigarettes?

13  A.  Cigars.

14  Q.  Cigars?

15  A.  Cigars.

16  Q.  And how much do those cigars sell for when you sell them?

17  A.  I don't have the slightest idea.  I don't sell them.

18  Q.  Haven't sold any of them?

19  A.  No.

20  Q.  How much is the PCP whenever you sell it?

21  A.  How much is PCP?

22  Q.  Yes, sir.

23  A.  When I buy it?

24  Q.  Yes, sir.

25  A.  Different prices, depending on who you get it from.

1    Q.    Now, have -- you were asked during direct examination about

2    the indictment there, it showed the I think the last arrest or

3    the last charge there being February 19th of 2015; is that

4    correct?

5    A.    Um-hum.

6    Q.    And your attorney asked you if you were ever charged with

7    anything after that date, didn't he?

8    A.    Um-hum.

9    Q.    And you told him no, didn't you?

10    A.    I wasn't.

11    Q.    You were charged with something after that date, though,

12    weren't you?

13    A.    I was?

14    Q.    Yes, sir.

15    A.    I don't know.

16    Q.    Do you remember on February 28th of that year that you were

17    arrested by the local police here for another possession of a

18    firearm in your car?

19    A.    I didn't know the exact date.

20    Q.    I'm sorry?

21    A.    I didn't know the date.

22    Q.    But it was after this date, after February 19th, that you

23    got stopped later purchasing a gun at a gun show; is that

24    correct?

25    A.    I guess.  Like I said, I didn't know the date.

1    Q.  I'm sorry?

2    A.  I didn't know the date.  I didn't know if it was before or

3    after.  I didn't know.

4    Q.  But do you recall being arrested for that, sir?

5    A.  Yes.

6    Q.  What kind of gun was that?

7    A.  A 9-millimeter, I think.

8    Q.  Pardon?

9    A.  I think it was a 9-millimeter.

10   Q.  A 9-millimeter?

11   A.  I think.

12   Q.  How did you buy that gun?  You were a convicted felon,

13   weren't you?

14   A.  Um-hum.

15   Q.  How did you buy the gun?

16   A.  Just went in there and bought it.

17   Q.  I'm sorry?

18   A.  I just went in there and bought it.

19   Q.  At a gun show?

20   A.  Um-hum.

21   Q.  Is that correct?

22   A.  Yes.

23           MR. RUSHING:  That's all I have, Your Honor.

24           THE COURT:  All right.  Redirect.

25           MR. KNAPP:  No redirect, Your Honor.

```
 1              THE COURT:  All right.  Mr. Nelson, you can return to
 2    your seat.
 3         Mr. Knapp, any other witnesses?
 4              MR. KNAPP:  I'd like just a second to confer with my
 5    client to answer that question, Your Honor.
 6         We rest, Your Honor.
 7              THE COURT:  Okay.  Government finally rest?
 8              MR. RUSHING:  Yes, Your Honor.
 9              THE COURT:  All right.  Would y'all like to argue your
10    motion, Mr. Knapp?
11              MR. KNAPP:  Yes, sir.
12              MR. RUSHING:  Which motion are we arguing?
13              THE COURT:  Let's start with the wiretap.
14              MR. KNAPP:  If the court would allow me to get
15    organized here.
16              THE COURT:  Okay.
17              MR. KNAPP:  Your Honor, relating to the motion on the
18    wiretap, the defendant contends that there was no necessity of
19    getting the wiretap, that they had other methods by which they
20    could obtain the information.
21         I have read the affidavit and application for the wiretap
22    on the 12th of February.  I mean that's the date of the
23    wiretap, not the day I read it.
24         My client just believes that there were several other
25    methods by which he could have been -- I mean the DEA could
```

1   have found out the information, and I listened to the DEA agent

2   when he discussed whether or not there were other methods.

3       But I do think it probative that all the counts in the

4   indictment, except Counts 10 and 11, predate the authorization

5   of wiretap February the 12th.  It makes an inference that the

6   wiretap was not necessary to prosecute this defendant.

7       I understand there are other people involved, but I do

8   think it's indicative that it wasn't this defendant.  And in my

9   memory of the affidavit on wiretap, showed several confidential

10  sources and how they had helped before, and without the

11  necessity -- well, I don't know that, Your Honor.  They didn't

12  refer to it, a particular wiretap, on the others.  But my

13  client does feel that there was no necessity, which is required

14  by the statute, to issue that wiretap.  It was unnecessary.

15      The government's response to the motion to suppress the

16  wiretap indicates that an issue of sentence entrapment was made

17  in my motion.  That's only partially true, Your Honor.

18      A sentence entrapment would be something for the sentencing

19  of this defendant should he be unsuccessful and entrapment

20  itself would be something for the trial.

21      We're not putting it, per se, out there as something to

22  support these motions, but, however, the motion is relevant

23  especially to the stop, because it is pursuant to this wiretap

24  of February the 12th that the information was given to the

25  detective and none of this would have happened without that

1    wiretap.  Everything depends on that wiretap, whether or not

2    the officer, detective -- I mean, not detective, deputy, would

3    have even followed the car.

4        He may have found or may not have found careless driving or

5    erratic driving, but he wouldn't have been out there looking

6    for my client's car if it wasn't for the information provided

7    by the wiretap.  And that's what we attack the evidence on

8    wiretap.

9        The, like I say, the other issues relating to entrapment

10   and/or sentence entrapment are for a later date.

11           THE COURT:  I'm going to take the two motions

12   separately.

13           MR. KNAPP:  Okay.

14           THE COURT:  Is that -- I'm not trying to cut you off.

15           MR. KNAPP:  Yes, Your Honor.

16           THE COURT:  Do you have anything else?

17           MR. KNAPP:  I understand.  I'll limit it to that.

18       Your Honor, that's really all I have on the wiretap, the

19   testimony the court's heard.

20           THE COURT:  Okay.  That motion was docketed at 53 in

21   the record, and I'm going to deny the motion.

22       Before a wiretap may be authorized, the government must

23   show and the court must find that other investigative

24   procedures have been tried and failed or that they reasonably

25   appear to be unlikely to succeed if tried or to be too

1  dangerous, under 18, USC, Section 2518(1)(c)(3)(c).

2  The government is not required to show that it has

3  exhausted every conceivable option before a wiretap can be

4  approved, as stated in United States versus Kelly, 140 Fed 3d

5  596, 605.  In this case the T3 application included I believe

6  21 pages addressing the necessity issue.  It outlined the

7  goals, and significantly the goals were not limited to

8  determining whether or not this defendant possessed PCP.  They

9  already knew that he did.

10  They explained the efforts and the conventional methods

11  that were used to investigate the case provided sufficient

12  reasons why those efforts would fall short of their stated

13  goals with specific examples of situations where there was

14  danger to an agent or an informant, not to mention the

15  limitations of the efforts that had already occurred in terms

16  of trying to determine the geographic scope, trace the drugs,

17  trace the money beyond this particular defendant.

18  I think that the application in this case was more than

19  sufficient on the necessity component, and therefore that

20  motion is denied.

21  All right.  Let's, let's look at the first motion.  I'm

22  sorry, the motion with respect to the Terry stop, which is

23  docketed at 47.

24  MR. KNAPP:  Thank you, Your Honor.

25  Your Honor, I've read through the answer filed by the

 1  government and done a little more research.  There is not a

 2  dispute as to the applicable law.

 3      This was a case where a deputy, who is a government

 4  employee, although not federal government, a county government,

 5  made a stop as -- in his role as a law enforcement authority,

 6  and he had two reasons, one was a telephone call which got him

 7  in the vicinity and to follow Mr. Nelson's automobile, but it

 8  also -- he had the erratic or careless driving, as is indicated

 9  by his testimony, and the defendant has testified contrary to

10  that, and that is a fact question for the court.

11      The search --

12          THE COURT:  Let me stop you there for a second.  Let's

13  assume for the sake of argument that he wasn't driving it

14  erratically, isn't the, isn't the question based on the

15  collective knowledge of the officers whether or not a

16  reasonable officer under the circumstance would have reasonable

17  suspicion which would necessarily include the wiretap and the

18  surveillance?

19          MR. KNAPP:  Yes, sir, the officer could consider both.

20          THE COURT:  And as I understand -- well, as I

21  understand the testimony today, the DEA instructed the Hinds

22  County Sheriff's Department to make a stop based on the

23  information they had at hand, which was again wiretap and

24  visual surveillance of the defendant.  Wouldn't that alone be

25  enough for reasonable suspicion?

1      MR. KNAPP:  Your Honor, considering the ruling,

2   previous ruling of the court, that would put someone under

3   suspicion with a federal agency telling you that these people

4   had guns and drugs in the car and asking them to stop it,

5   something of a reliable source, and coupled with the erratic

6   driving I would have to say --

7      THE COURT:  Even without the erratic driving is what

8   I'm asking.

9      MR. KNAPP:  I'm sorry, Your Honor?

10     THE COURT:  Even without erratic driving, based on the

11  totality of the circumstances, there would have been reasonable

12  suspicion that they had drugs in the car.

13     MR. KNAPP:  A reasonable suspicion, yes, sir.

14     THE COURT:  So the stop at its inception, which is the

15  first step of the Terry -- I don't think you're giving anything

16  away here because I think this is what the law says, that at

17  its inception the stop was okay.

18     MR. KNAPP:  Yes, sir.  I mean I can't argue with the

19  case law and the language therein, and it indicates, as the

20  court said, whatever's in the officer's mind, from whatever

21  source, would give him a reasonable suspicion.

22     THE COURT:  I want to make sure I understand the

23  standard.  I thought it was an objective standard, not

24  subjective.

25     MR. KNAPP:  Well, it's an objective standard, Your

1   Honor, but it's in the mind of the officer.

2        THE COURT:  Based on what the officer -- what that

3   officer knew?

4        MR. KNAPP:  Yes, sir.

5        THE COURT:  Okay.  I understand.

6        MR. KNAPP:  I am getting into the officer's mind, to

7   that extent.

8        THE COURT:  Say that last part again.

9        MR. KNAPP:  I am saying it depends on what was in that

10  officer's mind, whatever source or cause.

11       THE COURT:  I thought that, and this is why I want to

12  make sure I'm not incorrect, I thought the test was an

13  objective test: what would a reasonable officer do based on the

14  knowledge that was available to that particular officer.

15       MR. KNAPP:  I'm sorry, Your Honor.  I agree with that.

16  It is what a reasonable officer would do.

17       THE COURT:  Okay.  Okay.

18     All right.  So the second part of the -- I interrupted you.

19  You were about to say something else before we got into all of

20  that.

21       MR. KNAPP:  No, I was, I was going -- just proceeding

22  along, Your Honor.  If you have got a question, I'll be glad to

23  answer it now.

24       THE COURT:  Go ahead.

25       MR. KNAPP:  No, if you have got a question, I'll be

1  glad to answer it.

2         THE COURT:  I think you were about to move to the

3  second part of the Terry test, the search.

4         MR. KNAPP:  Yes, sir, I was.

5         THE COURT:  Please do.

6         MR. KNAPP:  And of course we indicated it was a Terry

7  search and that the elements of Terry would apply.  But we do

8  believe that consent also, and I know this is close to the

9  probable cause or reasonable cause, the consent is a factual

10 dispute by the court, and it is determined by the credibility

11 of the witnesses but also is dependent on the voluntariness and

12 several other factors, and I think that is a question for the

13 court to make, taken into the Terry factors.  And the evidence

14 that has been presented today has addressed whether consent was

15 given.

16    It hangs -- there is a lot of facts in here that are in

17 dispute, whether the guns were covered, whether they were not

18 covered, what the passenger said was -- one gun was his, my

19 client said both guns were his.  And, you know, I wasn't there,

20 but I do feel that in addition to probable cause to stop the

21 vehicle, that there must have been something to allow the

22 search, either consent or a reasonable person would believe

23 that there was something -- I forgot the exact language, but it

24 deals with whether a crime could be committed, and I believe

25 the court does have some factual issues to decide on these

1    issues.

2        Again, we, we don't have a dispute as to the law that the

3    government has presented to the court, especially Terry versus

4    Ohio, and we submit that it was a wrongful search.

5            THE COURT:  All right.  Thank you.

6        I'm sorry, Mr. Rushing.  Go ahead.

7            MR. RUSHING:  Yes, Your Honor.

8            THE COURT:  Let me cut to the chase just a little bit

9    on the first prong on the Terry versus Ohio.

10           MR. RUSHING:  Yes, sir.

11           THE COURT:  And I want to make sure I'm mentally

12   applying the right test here.  It is an objective test based on

13   the totality of the circumstances?

14           MR. RUSHING:  It is, Your Honor.  I set forth that in

15   my response also.

16           THE COURT:  All right.  And even if he wasn't

17   swerving, I don't know that you made this argument because

18   you -- in your brief, but even if he wasn't swerving --

19           MR. RUSHING:  I did, Your Honor.

20           THE COURT:  -- the totality of the circumstances and

21   the collective knowledge of the agents, would that provide

22   reasonable suspicion to make the initial stop?

23           MR. RUSHING:  Yes, Your Honor.  Because previous,

24   before the actual stop was conducted, these officers upon a

25   wire intercept of the defendant's phone and they heard the

1    calls being made where he was trying to buy the PCP -- well,

2    first of all, where he is trying to -- someone is trying to get

3    PCP from him, and then later, when he was trying to actually

4    purchase or obtain PCP from different sources and all, the

5    agents conducted a surveillance after that, they decided to go

6    meet with individuals, and of course also there was mention

7    about getting a gun also, and they were able to hear those

8    conversations and watch the person as he went to actually

9    conduct those different types of stops to either get the gun or

10   also the PCP.

11       And based upon that, they had a reasonable suspicion that

12   criminal activity was afoot, Your Honor.

13           THE COURT:  Refresh my recollection just a second on

14   the record.  I seem to recall Officer Sims or Detective Sims

15   testifying that when he received the call that he was informed

16   that there would be drugs and guns in the car.

17           MR. RUSHING:  He said drugs or -- drugs, and I think

18   he said stolen weapons is I believe what he testified about,

19   Your Honor.

20           THE COURT:  Stolen weapons.

21           MR. RUSHING:  Stolen weapons is what he was -- was his

22   understanding at the time, so...

23           THE COURT:  Okay.  So let's look then at the actual

24   search.  There is obviously a fact question whether or not

25   consent was given.  Just for the sake of argument, assume that

1  | there was no consent.

2  | MR. RUSHING:  Yes, sir.  I still think you have

3  | probable cause because, based upon what the officers saw that

4  | day, heard on the radio about obtaining the PCP, the

5  | surveillance of the officers as they followed Mr. Davis through

6  | the neighborhood to where he met with individuals raised a

7  | suspicion of probable cause to believe that at that point in

8  | time he's picked up the actual -- especially when they talk

9  | about the price on the wire and they're talking about the

10 | actual location to where it's going to meet at and whether or

11 | not to bring an actual container to put it in, like Officer

12 | Rainer testified during his examination -- during his

13 | testimony, I believe.

14 | On those conditions there, I think those help establish

15 | probable cause once he actually stops the vehicle to search for

16 | those type of substances at that point in time, without the

17 | consent itself.

18 | THE COURT:  Okay.

19 | MR. RUSHING:  Additionally, when the officer's there,

20 | of course without the consent, the officer's there and he is

21 | asking if there is anything inside the vehicle, and for his

22 | safety, you know, one of the guys says it's a gun, and so for

23 | his safety he checks that out.  But then all the PCP, of

24 | course, he testified about is in plain view there in the actual

25 | holder, the cup holder there, that area where the

1  actual --between the front passenger seat and the driver's seat

2  also.

3  Your Honor, if I recall, also, he testified that he, on

4  previous occasions, seen people with PCP in those containers as

5  being a police officer in this area where he saw PCP in the

6  same type of containers that was in that one also.  But I

7  believe, additionally, while he's conducting a safety sweep, he

8  talks about the cigarette.  The cigarette contains marijuana,

9  and also the smell, you could smell inside the vehicle at that

10  point in time also.

11  I think all of those go to show probable cause for the

12  search even without a consent, Your Honor.

13          THE COURT:  Okay.

14          MR. RUSHING:  If you take all those circumstances into

15  consideration together, I think that would lead up to a

16  probable cause aspect.

17          THE COURT:  Okay.  Anything else?

18          MR. RUSHING:  I think the consent, also, Your Honor,

19  of course that's for the court to decide, you know, whether he

20  obtained consent or not, but I don't think we need to go that

21  far, necessarily, but I think the officer testified that he in

22  fact obtained consent.

23          THE COURT:  Okay.  All right.  Thank you.

24          MR. RUSHING:  Thank you, Your Honor.

25          THE COURT:  Any rebuttal?

1              MR. KNAPP:  No rebuttal, Your Honor.

2              THE COURT:  All right.  The motion to suppress

3    docketed at 47 is going to be overruled.

4        An investigative vehicle stop is permissible under Terry

5    versus Ohio only when the officer has a reasonable suspicion

6    supported by articulable facts that criminal activity may be

7    afoot.  To determine the propriety of such a stop, we first

8    examine whether the officer's action was justified at its

9    inception, and then inquire whether the officer's subsequent

10   actions were reasonably related in scope to the circumstances

11   that justified the stop.

12       Although a mere hunch will not suffice, a reasonable

13   suspicion need not rise to the level of probable cause.

14       Reasonable suspicion is based on the collective knowledge

15   and experience of the officers involved, as stated in United

16   States versus Holloway, 962 Fed 2d 451 at Note -- I'm sorry,

17   451 -- 459, Note 22.

18       In examining the second part of the Terry inquiry, in

19   general the detention must be temporary and last no longer than

20   is necessary to carry out the purpose of the stop.

21       The recognized exception to this rule is that if additional

22   reasonable suspicion arises in the course of the stop, then the

23   detention may continue until the new reasonable suspicion has

24   been dispelled or confirmed.

25       In this case the evidence begins with Agent Rainer, who

testified that they had wiretap communications between the
defendant and others regarding the sale of PCP and regarding
the possession of a firearm.

We also note from the record that the defendant did appear
at the agreed-to pickup location, which obviously provides a
substantial amount of evidence, and there was visual
surveillance of that exchange.

DEA notified Hinds County, Officer Sims testified that he
was informed that the defendant would have PCP and possibly
stolen weapons.  He conducted a traffic stop.  I credit his
testimony with respect to the defendant's driving, but having
said that, it really wouldn't matter in this case.  There was
reasonable suspicion even if he had not been driving
erratically.

The case is similar to cases like United States versus
Montoya, 566 Federal Appendix 303, where the court said that
even if there had been no traffic violations the stop would
still be permissible at its inception because they had similar
evidence of drug activity as what we have here.

I also looked at United States versus Stevens, 487 Fed 3d
232, United States versus Ibarra-Sanchez, that's I-B-A-R-R-A
dash Sanchez, and United States versus Coleman, I think these
are all supportive of a finding that the stop was based on
reasonable suspicion.

Regarding what happened next, there is no dispute in the

1    record that the officer was informed that there was indeed at

2    least a firearm in the vehicle, if not two.

3        The officer also testified that he smelled marijuana coming

4    from the car, that he could see in plain view, in the console,

5    a vanilla extract bottle, which he knew from experience could

6    be used to, to contain PCP, and the fact that he testified that

7    he had seen others in this neighborhood use those bottles,

8    including the defendant himself use those types of bottles for

9    this particular drug.

10        He also saw what he -- saw a cigar, and there's, you know,

11    testimony that, that he would have perceived that in

12    conjunction with the PCP as being a blunt.

13        The stop itself happened about two years ago, or over two

14    years ago.

15        I think that the most credible record of whether or not

16    consent was given is found in the incident report, which

17    indicates that consent was given.  But even if consent had not

18    been given, this totality of circumstances would have created

19    probable cause for the officer to look in the vehicle.

20        And based on all that, I find that the motion should be

21    overruled.

22        All right.  Is there anything else that we need take up at

23    this time?

24            MR. RUSHING:  No, Your Honor.

25            THE COURT:  Mr. Knapp, anything further from the

1    defendant?

2              MR. KNAPP:  No, Your Honor.

3              THE COURT:  All right.  Thank you.

4         We're adjourned.

5              MR. RUSHING:  Thank you.

6              THE CLERK:  All rise.

7         (Proceedings concluded at 3:34 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE OF COURT REPORTER

    I, Fred W. Jeske, RMR, CRR, Official Court Reporter for the United States District Court for the Southern District of Mississippi, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing is a correct transcript of the proceedings reported by me using the stenotype reporting method in conjunction with computer-aided transcription, and that same is a true and correct transcript to the best of my ability and understanding.

    I further certify that the transcript fees and format comply with those prescribed by the Court and the Judicial Conference of the United States.

*S/Fred W. Jeske*

_____

FRED W. JESKE, RMR, CRR
OFFICIAL COURT REPORTER